UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

PETER T. ROUKIS,                                        :

                              Petitioner,               :

         -against                                       :

UNITED STATES,                                          :

                              Respondent.               :

------------------------------------------------------------------X

```
┌─────────────────────────────┐
│ USDC SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #: _____      │
│ DATE FILED: ___1/23/13__    │
└─────────────────────────────┘
```

10 Civ. 2219 (RA) (DF)

**REPORT AND
RECOMMENDATION**

**TO THE HONORABLE RONNIE ABRAMS, U.S.D.J.:**

*Pro se* petitioner Peter T. Roukis ("Petitioner"), a former member of the United States

Army (the "Army"), seeks a writ of habeas corpus under 28 U.S.C. § 2241, following his

conviction by a general court-martial,[1] of absence without leave, assault consummated by a

battery, and premeditated murder. (*See* Amended Petition Pursuant to 28 U.S.C. § 2241, dated

June 4, 2010 ("Pet. Mem.") (Dkt. 20).) For these convictions, Petitioner received a dishonorable

discharge, forfeiture of all pay and allowances, reduction to Private E1, a reprimand, and a

sentence of confinement for life. (*See* United States Army's Response to Petition for Writ of

Habeas Corpus Pursuant to 28 U.S.C. § 2241, dated July 30, 2010 ("Resp. Mem.") (Dkt. 24),

Ex. 11, at AR000252 (General Court-Martial Order No. 19, dated Dec. 3, 1999 ("12/3/99 Gen.

Ct. Martial Order")).) He is currently incarcerated at the Victorville Federal Correctional

---

[1] By way of the Uniform Code of Military Justice ("UCMJ"), 10 U.S.C. §§ 801-935,
Congress has established several methods for addressing offenses by servicemembers. *See
De Louis v. United States*, No. 94-1042C, 1998 U.S. Claims LEXIS 117, at *4 (Fed. Cl. May 11,
1998). One of these methods, the general court-martial, which is "somewhat analogous to the
concept of [a] felony . . . court[]," is relevant in this case. *Id.* General court-martials "may try
servicemembers for any punishable offense under the UCMJ and are authorized to order any
lawful sentence, including the penalty of death . . . . Lawyer judges preside over a general [court-
martial]. . . and the servicemember is entitled to the full panoply of rights such as the rights to
appointed defense counsel and a jury trial and the rights to confront witnesses and remain silent.
Servicemembers may not refuse [a] general [court-martial]." *Id.* at 4-5.

Institution ("Victorville"), in Adelanto, California.  (*See* Notice of Change of Address, filed

Nov. 14, 2012  ("Pet. Not. Address") (Dkt. 37).)

        In this Court, Petitioner raises four claims:

        (1)        that he was denied a "substantial pre-trial right," based on the fact that, despite defense counsel's expressed concerns regarding Petitioner's mental competency to participate in his own defense, the Government proceeded to conduct a pre-trial investigation pursuant to Article 32 of the UCMJ, 10 U.S.C. § 832,[2] and then denied Petitioner's subsequent motion for a new Article 32 investigation;

        (2)        that his constitutional rights were violated by the presiding judge's allegedly erroneous admission into evidence of certain incriminating statements;

        (3)        that, in two ways, he was deprived of the effective assistance of trial counsel; and

        (4)        that, because he was not provided with an opportunity to contest his transfer from the United States Disciplinary Barracks ("USDB") at Fort Leavenworth, Kansas ("Fort Leavenworth"), to a civilian prison within the Federal Bureau of Prisons ("BOP"), he was denied equal protection and due process of law, and, as a result of his current incarceration in a civilian prison, he continues to be denied these constitutional rights.

(Pet. Mem., at 1-2.)

        For the reasons set forth below, I recommend that the Amended Petition be denied in its

entirety.

---

    [2] An Article 32 investigation is "the military counterpart to a civilian grand jury." *Morgan v. Perry*, 142 F.3d 670, 677 (3d Cir. 1998).  Article 32 dictates that, before proceeding to a court-martial, the Army must first appoint an investigating officer "to investigate the crimes and to recommend whether the charges . . . should be referred by the general court-martial convening authority (the post commander) to a general court-martial for trial." *United States v. MacDonald*, 435 U.S. 850, 851 (1978).

## BACKGROUND

### A.   Factual Background

According to evidence presented at Petitioner's court-martial, on the night of April 19, 1997, while in his on-post quarters at Fort Polk, Louisiana, Petitioner, who at that time was a private in the United States Army, committed a series of increasingly violent acts against his wife, Jennifer Roukis ("Jennifer"), resulting in her death.  First, Petitioner struck Jennifer in the face; next, Petitioner strangled her with his hands, and, after he noticed that she was still breathing, he strangled her with a boot lace; then, Petitioner, who admittedly "'wanted [Jennifer] dead,'" as he "'needed to be sure [that] she would not talk,'" checked her pulse and determined that she was still alive, so he walked to the kitchen, picked up a serrated knife, and stabbed her in the chest with that knife; and, finally, Petitioner, dissatisfied with that serrated knife, grabbed a carving knife and proceeded to slice Jennifer's throat by moving the knife back and forth across her neck as if he were sawing a piece of wood.  (*See* Resp. Mem. Exs. 1-A (Opinion of the Court, dated Mar. 2, 2005 ("3/2/05 Opinion")), at 4, Ex. 9 (Brief on Behalf of the United States, filed May 19, 2003), at AR000080-81).)

On April 21, 1997, military authorities discovered Jennifer's lifeless body on the floor of Petitioner's quarters.  (*See* 3/2/05 Opinion, at 4.)  There was a bootlace around her neck and a carving knife embedded in her neck.  (*Id.*)  Meanwhile, having assured himself that Jennifer was finally dead (*see id.* (Petitioner stating that "'her eyes were dull and kind of rolled back in her head'")), Petitioner fled Fort Polk and went to New York City, where his parents resided (*id.*).  Two days later, pursuant to a federal warrant for Petitioner's arrest, Detective John Collins of the New York City Police Department arrested Petitioner.  (*See id.*, Ex. 1-D (Motion to Suppress Statements of Accused, dated Jan. 19, 1998 ("Mot. to Suppress Collins' Testimony")), ¶ 3.)

3

In light of subsequently-produced evidence, including statements attributed to Petitioner, it appears that Petitioner committed the violent acts that led to Jennifer's death because he had apparently believed either that she had committed adultery on numerous occasions and/or that she would leave him for someone else.  This evidence included the following:  a sworn statement by Private Daniel Nichols ("Nichols") to Criminal Investigation Command, stating that, approximately three weeks before Petitioner killed Jennifer, Petitioner told him,"'[i]If [Jennifer] leaves me, I might do something like kill her'" (*id.*, Ex. G (Motion to Suppress Accused's Statements Made to PVT Nichols, dated Jan. 12, 1998 ("Mot. to Suppress Nichols' Testimony")), ¶ 2); testimony by Petitioner that, just moments before he commenced his fatal assault upon Jennifer, she told him that she had been having an extramarital affair with Specialist Timothy McCarty, and then she attempted to leave the on-post quarters that she shared with Petitioner (*see id.*, Ex. 10 (Brief on behalf of Appellant, dated May 20, 2002 ("5/20/02 Pet. Mem.")), at AR000158); and testimony by Detective Collins that, on April 23, 1997, Petitioner said the following:  "'Detective Collins, . . . Let me ask you something.  If your old lady was out there fucking everybody on the base, what would you do? . . .  You would have killed her, too. You would have done the same thing I did'" (*id.*, Ex. 30, at 790:11-18 (Transcript of Motion to Suppress Hearing ("Hearing Tr."))).

At all times relevant to the instant Petition, Petitioner has acknowledged that he killed Jennifer (*see, e.g.*, *id.*, Ex. F, at 1 (Petitioner's post-trial counsel stating that Petitioner had "openly admitted that he had taken the life of his wife")), but he has also contended, and continues to contend, that his actions were not premeditated (*see, e.g.*, 3/2/05 Opinion, at 4 (citing Petitioner's statement that he had told Special Agent Marker of the United States Army Criminal Investigation Command that "'he had killed his wife, but it was not premeditated'")).

4

B.      **Procedural History**

1.      **The Article 32 Investigation**

On May 27 and 28, 1997, after having granted Petitioner's request to adjourn the

Article 32 investigation until May 27, but having also denied his request for a second

adjournment of such proceeding, Major Mark G. Edgren ("Edgren"), pursuant to 10 U.S.C.

§ 832, conducted an Article 32 investigation of the "facts and circumstances concerning the

charges preferred against [Petitioner]" – AWOL, assault, and premeditated murder (the

"Investigation"). (*See id.*, Ex. 14, at AR000353 (Memorandum for Private First Class Peter J.

Roukis Jr., dated May 1, 1997 ("5/1/97 Mem.")), AR000365 (Investigating Officer's Report,

dated May 29, 1997 ("Article 32 Report")).) At the outset of the Investigation, defense counsel

James J. Miller, Esq. ("Miller") objected to proceeding with the Investigation on several

grounds, one of which was that a civilian psychiatrist had not examined Petitioner prior to the

Investigation. (*See id.*, Ex. 14, at AR000333 (Memorandum for Commander, Second Armored

Cavalry Regiment, dated June 5, 1997 ("6/5/97 Resp. Mem.")), AR000365 (Article 32 Report

(summarizing Petitioner's objections)).) Edgren considered Petitioner's objections and then

proceeded with the scheduled Investigation, as he concluded that "none of the objections were

warranted or should cause the [Investigation] to be further delayed." (*Id..*)

As part of the Investigation, 17 witnesses testified under oath, including Petitioner's

parents. (*Id.* at AR000364-65.) On May 29, 1997, Edgren issued a report, finding "the charges

of AWOL, assault, and premeditated murder to be correct and substantive." (*Id.* at AR000366;

*see also id.*, Ex. 12 (listing the charges that were to be the subject of the Article 32

investigation).) Edgren further concluded that "reasonable grounds exist[ed] to believe that

[Petitioner had] committed the offenses alleged." (Article 32 Report, at AR000366.)

On June 5, 1997, Petitioner moved for a new Article 32 investigation. (*See id.* Ex 14, at AR000336-41 (Memorandum for Commander, 2d Armored Cavalry Regiment, dated June 5, 1997 ("6/5/97 Pet. Mem.")).)  In support of Petitioner's motion, Miller submitted a six-page memorandum, in which he argued that Petitioner's mental competency, *inter alia*, "severely prejudiced" Petitioner in "his rights to present matters under Article 32, UCMJ." (*Id.* ¶ 11.)  The Government submitted a three-page memorandum in opposition to Petitioner's motion. (*See* 6/5/97 Resp. Mem., at AR000333-35.)  Colonel Dennis E. Hardy considered Petitioner's "objections to the [Investigation], [and] determined that the [Investigation] . . . was impartial and sufficient," and "therefore den[ied] [Petitioner's] request for a new Article 32 investigation." (*Id.* at AR000331 (Memorandum for Trial Defense Service, dated June 15, 1997).)

On February 8, 1998, Samuel S. Thompson, III, Brigadier General, U.S. Army Commanding, after considering, *inter alia*, Edgren's report, "confirm[ed] and adhere[d] to [his] previous referral . . . referring all charges and specifications [against Petitioner] to a General Court-Martial authorized to adjudge a capital sentence." (*Id.*, Ex. 13, at AR000306.)

2.    **Plea Negotiations**

Prior to and during his court-martial, Petitioner was represented by Miller. (*Id.*, Ex. 31 (Declaration of James J. Miller, Jr., dated July 9, 2010 ("Miller Decl.")), at 1.)  In a sworn declaration (submitted by the Government in opposition to one of Petitioner's later applications for relief), Miller asserts that, in the course of his representation, he had "constantly and consistently apprised" Petitioner of the status of his case, meeting with him "on a weekly basis" at either Miller's office or the Vernon Parish Jail, in Louisiana. (*Id.* ¶ 17.)  According to Miller, he also met, early on, with Petitioner's immediate family in New York, and he maintained "continuous contact" with the family thereafter. (*Id.* ¶ 10.)  Miller states that he, as well as

6

Petitioner and Petitioner's family, were all very concerned about the status of Petitioner's case, as the Government had made it clear that it intended to proceed to a capital court-martial; *i.e.*, the Government planned to seek the death penalty. (*Id.* ¶ 15.)

In that same declaration, Miller asserts that, despite Petitioner's claims to the contrary, the Government had made no plea offer to Petitioner, but, rather, defense counsel had proposed a plea deal *to the Government*. (*Id.* ¶ 8.) Under the deal proposed by the defense, Petitioner would have pleaded guilty to "unpremeditated murder," in exchange for a maximum sentence of 40-years confinement. (*Id.*) Miller asserts that the Government "advised [him] that it would not support such a deal" (*id.*), and it made no counter-offer (*id.*). The record supports Miller's assertions, as it is devoid of any evidence that supports the notion that Miller failed to inform Petitioner of a plea offer, or that the Government ever made such an offer.

In addition to his efforts to obtain a plea offer from the Government, Miller attempted to convince it to forgo seeking the death penalty. To that end, Miller facilitated a meeting in which General Thompson met with a spiritual advisor for death row inmates, Sister Helen Prejean.[3] Despite this meeting and Miller's repeated attempts to convince the Government to reconsider the death penalty, it refused to do so. (*Id.* ¶¶ 13-16.)

### 3.     Pre-Trial Motion To Suppress Evidence

Prior to his court-martial, Petitioner, through a team of at least three attorneys, moved to suppress all statements that he had made to Detective Collins. (*See* Mot. to Suppress Collins' Testimony). In a three-page memorandum, defense counsel argued that Detective Collins had elicited these incriminating statements from Petitioner while Petitioner was "physically

---

[3] Sister Helen Prejean is the nun who was portrayed by Susan Sarandon in the movie *Dead Man Walking*.

exhausted and heavily medicated," and without first having advised Petitioner of his right to
remain silent or of his right to counsel. (*Id.* at AR000743a.)  The Government submitted a
memorandum in opposition to Petitioner's motion. (*Id.* at AR000743e.)  After reviewing
"[Petitioner's] exhibits, the case law, the Constitution, [and] Counsel's arguments," hearing
testimony from Detective Collins, "accessing the credibility of the witnesses," and making
"extensive findings of fact" (Hearing Tr., at 1026:9-12), the presiding judge denied Petitioner's
motion (*id.* at 1031:9-32:17).

### 4.    **Petitioner's Trial (Court-Martial)**

The Army tried Petitioner by a general court-martial composed of officer and enlisted
members authorized to adjudge death, with a military judge presiding.  In his sworn declaration,
Miller asserts that, shortly before the trial commenced, he concluded that "this was no longer a
case of "'who-dun-it,'" as the admissible evidence "overwhelmingly proved [Petitioner's] guilt."
(Miller Decl. ¶ 21.)  Consequently, Miller adopted a new trial strategy (*see id.* ¶ 22), by which he
conceded that Petitioner had killed Jennifer, but contended that he had killed her in a blind rage,
and, therefore, that his actions were not premeditated (*id.*).

As part of that strategy, Miller put forth evidence that was intended to show that
Petitioner and Jennifer were young newlyweds who met right after high school, that their love
for each other, coupled with their age, created a tumultuous marriage, and that these factors
collectively placed Petitioner in a fragile mental state, ultimately leading Petitioner to kill
Jennifer in the heat of passion. (*See id.* ¶ 22.)  Miller also waived his yet-to-be ruled upon
pre-trial objection to the admission of incriminating statements made by Petitioner to Nichols.
(*See* Mot. to Suppress Nichols' Testimony ¶ 2 (seeking suppression of Petitioner's statement to
Nichols that "'[i]f she leaves me, I might do something like kill her'"); *see also* Miller Decl. ¶ 21

8

(Miller stating reasons for waiving objection).)  In his opening statement, Miller preemptively mentioned Nichols' testimony, which he presented as being part of defense counsel's overall trial strategy.  (*See id.* ¶ 23.)  Miller subsequently cross-examined Nichols and elicited testimony, which, according to Miller, both painted Petitioner as a person who had loved his wife and downplayed the significance of Petitioner's incriminating statements.  (*Id.*)  Miller concluded that Nichols had provided "all the favorable testimony [defense counsel] desired." (*Id.*)

The Government countered Miller's trial strategy by, *inter alia*, calling Dr. Thomas S. Mego, a pathologist (*see id.*, Ex. 30, at 790:11-18 (Excerpt from Transcript of Court Martial ("Court Martial Tr."))), and Dr. James A. Wilkerson, a forensic pathologist, to the stand (*see id.* at 2128:10-2163:3).  Dr. Mego and Dr. Wilkerson had each independently reviewed the nature and extent of Jennifer's injuries and provided expert testimony.  (*See id.* at 1749:10-55:19; 2131:9-2163:3.)  Defense counsel, who had previously conferred with Dr. Mego regarding Petitioner's state of mind at the time he killed Jennifer, cross-examined Dr. Mego and elicited opinion testimony that somewhat supported the notion that Petitioner had killed Jennifer in a blind rage.  (*See id.* at 1761:2-11 (Dr. Mego testifying that one possible explanation was that Petitioner acted out of rage)).  On redirect examination, however, and over defense counsel's objection, the Government asked further questions of Dr. Mego that resulted in the introduction of highly incriminating statements that Petitioner had made to Dr. Kevin Moore, a psychiatric expert who had been retained by Petitioner.  (*See id.* at 1762:1-76:3.)  Dr. Mego testified that he had been unaware of those statements, and, therefore, had not considered them when forming his opinion as to Petitioner's mental state.  (*Id.*)  The judge ruled that the statements were admissible, as Petitioner's counsel "had opened the door." (*Id.* at 1763:7-8.)

9

At the conclusion of the Government's case in chief, the general court-martial convicted Petitioner of premeditated murder, as well as assault consummated by a battery, in violation of Articles 86, 118, and 128 or the Uniform Code of Military Justice, 10 U.S.C. §§ 886, 918, and 928.  On April 22, 1998, the members sentenced Petitioner to a dishonorable discharge, forfeiture of all pay and allowances, reduction to Private E1, a reprimand, and a sentence of confinement for life.  (*See* 12/3/99 Gen. Ct. Martial Order.)  On December 3, 1999, the Convening Authority approved the sentence as adjudged.  (*Id.*)

### 5.    **Direct Appeal**

Petitioner, through appellate counsel, appealed his conviction and sentence to the United States Army Court of Criminal Appeals ("ACCA"), claiming nine alleged errors.  (*See* 5/20/02 Pet. Mem.)  Among other things, Petitioner argued, in a 62-page brief, (i) that the evidence produced at trial was legally and factually insufficient to support the element of premeditation (*id.* at AR000161); (ii) that the presiding judge erred in failing to suppress statements that Petitioner had made to Detective Collins (*id.* at AR000192); and (iii) that Petitioner received ineffective assistance of trial counsel (*id.* at AR000203).  On March 2, 2005, the ACCA upheld Petitioner's conviction and sentence (3/2/05 Opinion, at 9), finding, *inter alia*, that Petitioner's "acts, character, and mental state at the time of the offense place this case squarely within the 'heartland' of premeditated murder offenses" (*id.*), and denying Petitioner's remaining claims as "without merit" (*id.*).

In May 2005, Petitioner appealed to the United States Court of Appeals for the Armed Forces ("CAAF"), by filing a petition of appeal for grant of review of the decision of the ACCA. (*See id.*, Ex. 4, at AR000011 (Supplement to Petition for Grant of Review, dated May 31, 2005).)  In that petition, Petitioner raised the same claims of insufficient evidence of guilt and

10

ineffective assistance of counsel that he had raised before the ACCA. (*Id.*) On September 9, 2005, the CAAF granted the petition of appeal for grant of review, and affirmed the decision of the ACCA. (*Id.*, Ex. 3 (Order, dated Sept. 9, 2005).)

On December 7, 2005, after the CAAF had affirmed Petitioner's conviction and sentence (*see id.*, Ex. 2, at AR000004 (General Court-Martial Order No. 26, dated Sept. 21, 2005 (stating that Petitioner's conviction and sentence "ha[d] been finally affirmed"))), Petitioner received a Dishonorable Discharge from the Army (*id.*, Ex. 2, at AR000002, AR000003 (Order 30-2, dated Jan. 30 2006)).  Nine months later, the Army ordered Petitioner, who at that time was confined at Fort Leavenworth, and had been since his conviction, to serve the remainder of his sentence of confinement for life at a civilian correctional facility within the BOP. (*See id.*, Ex. 2, at AR000001 (Order 249-8, dated Sept. 6, 2006).)  Consequently, on September 12, 2006, Petitioner, who was no longer an active member of the Army, was transferred to the United States Penitentiary at Lewisburg, Pennsylvania ("Lewisburg"). (*See id.*; Pet. Mem., at 10)  Since the date of that transfer, Petitioner has been confined at various civilian prisons within the BOP.

**6.       Petitions for Extraordinary Relief in the ACCA and CAAF**

Following Petitioner's failed direct appeal of his conviction and sentence, Petitioner filed six petitions for extraordinary relief.  In each case, Petitioner provided the military appellate court with a brief that discussed Petitioner's claims.

In January 2008, Petitioner filed a petition with the ACCA in which he argued that, because he was being confined at a civilian prison within the BOP, rather than at the USDB, as were some other military prisoners who had received a dishonorable discharge from the Army, and because the "conditions of confinement within the BOP [were] entirely different than those at the USDB," (i) Petitioner was being subjected to "cruel and unusual punishment," and

11

(ii) Petitioner's constitutional rights to due process and equal protection were being violated. (*Id.*, Ex. 29, at AR001500-01 (Petition for Extraordinary Relief, dated Jan. 12, 2008 ("1/12/08 Pet.")).) According to Petitioner, the environment within the BOP was "one of criminality . . . and violence [and] the inmate population generally consisted of gang members, drug cartels, illegal aliens and terrorists." (*Id.* at AR001501.) Moreover, he claimed that relevant legal resources were "severely limited." (*Id.*) As a remedy, Petitioner asked the ACCA to order his return to Fort Leavenworth. (*Id.* at AR001496.) The ACCA considered his petition (*id.* Ex 29 (Letter from Malcolm H. Squares, Jr., Clerk of Court, to Petitioner and Respondents, dated Jan. 22, 2008 (informing Petitioner that his petition for extraordinary was referred for consideration))), and denied it on January 30, 2008 (*id.*, Ex. 28 (Order, dated Jan. 30, 2008 ("1/30/08 Order"))).

In February 2008, Petitioner filed a substantively identical petition with the CAAF (*see id.*, Ex. 27 (Petition for Extraordinary Relief, dated Feb. 19, 2008)), and later moved to attach documents to that petition. The Government moved to dismiss the petition for lack of jurisdiction. (*See id.*, Ex. 26 (Motion to Dismiss Appellant's Petition for Lack of Subject Matter Jurisdiction, filed March 7, 2008).) The CAAF considered the petition, and, on April 2, 2008, granted Petitioner's motion to attach documents to the petition, denied the petition on the merits, and denied as moot the Government's motion to dismiss the petition for lack of subject-matter jurisdiction. (*See id.*, Ex. 25 (Order, dated April 2, 2008).)

Eighteen days later, Petitioner filed a petition for a writ of habeas corpus in the ACCA, requesting reversal of his conviction based on, *inter alia*, two of the same claims that he had previously raised with the military court in pre-trial motions, *i.e.*, his claims that (1) his rights were violated when, over objection, the Government had proceeded to conduct an Article 32

investigation and then later refused to conduct a second investigation, and (2) the presiding judge at the court-martial erred by failing to suppress certain incriminating statements made by Petitioner. (*See id.*, Ex. 21 (Petition for Extraordinary Relief in the Nature of a Writ of Habeas Corpus, dated Dec. 26, 2008 ("12/26/08 Pet.")).)  Petitioner also again raised a claim that he had been denied the effective assistance of trial counsel. (*See id.*)  The ACCA considered the petition (*id.* Ex 20 (Letter from Randall M. Bruns, Jr., Deputy Clerk of Court, to Petitioner and Respondents, dated Dec. 31, 2008 (informing Petitioner and the Government that Petitioner's petition was referred for consideration))) and, on January 8, 2009, denied it (*id.*, Ex. 19 (Order, dated Jan. 8, 2009 ("1/8/09 Order"))).  On February 25, 2009, Petitioner filed a writ-appeal petition for review with the CAAF, raising these same arguments. (*See id.*, Ex. 18 (Writ Appeal Petition for Review of US Army Court of Criminal Appeals Decision on Application for Extraordinary relief in the Nature of a Writ of Habeas Corpus, dated Jan. 28, 2009 ("1/28/09 Pet.")).)  The CAAF considered that petition, and denied it on April 28, 2009. (*Id.*, Ex. 18 (Docketing Notice and Order, dated April 28, 2009 ("4/28/09 Order")).)

On August 31, 2009, Petitioner filed another petition for extraordinary relief with the CAAF. (*See id.*, Ex. 17 (Motion for Appropriate Relief, dated Aug. 12, 2009 ("Pet. 8/12/09 Mot.")); Ex. 16 (Docketing Notice and Order, dated Sept. 24, 2009 ("9/24/09 Order")).)  This time, Petitioner requested that the CAAF "conduct further fact-finding to determine what judicial relief the petitioner is entitled to pursuant to the provisions of Article 67, Uniform Code of Military Justice." (Pet. 8/12/09 Mot., at AR000909.)  The CAAF considered this petition, and denied it on September 24, 2009. (*See* 9/24/09 Order.)

Finally, on April 15, 2010 – after having also filed a federal habeas petition in the Eastern District of New York, pursuant to 28 U.S.C. § 2241 (*see infra* at Point 7) – Petitioner

13

filed another petition for extraordinary relief with the CAAF. (*See id.*, Ex. 16 (Petition for

Extraordinary Relief, dated April 7, 2010 ("4/7/10 Pet.")); (Docketing Notice, dated May 19,

2010 ("5/19/10 Notice")).)  In that petition, Petitioner asserted that his confinement in a civilian

prison within the BOP violated his constitutional rights to due process and equal protection, once

again asking the CAAF to order the Army to transfer him to the USDB at Fort Leavenworth.

(4/7/10 Pet., at AR000900-01.)  The CAAF considered that petition, and denied it on May 19,

2010. (*See* 5/19/10 Notice.)

### 7.   Petitioner's Current Habeas Petition

On December 4, 2009, after Petitioner had been transferred (for reasons that have not

been explained to this Court) to the Metropolitan Detention Center ("MDC") in Brooklyn, New

York, Petitioner filed a federal habeas petition in the United States District Court for the Eastern

District of New York. (*See* Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241,

dated Dec. 2, 2009 ("First § 2241 Pet.") (Dkt. 1).)[4] Approximately one month later, however,

Petitioner was transferred from the MDC to the Federal Correctional Institution in Otisville,

New York ("Otisville"), and, as Otisville is located within this district, the Eastern District

proceeded to transfer Petitioner's Section 2241 petition to this Court. (*See* Transfer Order, dated

Mar. 11, 2010 (Dkt. 14).)[5]

---

[4] As Petitioner was being held at the MDC at the time he filed this habeas petition, and as
the MDC is located within the Eastern District of New York, that district was a proper venue for
Petitioner's § 2241 habeas petition. *See Jabarah v. Garcia*, No. 08-CV-3592, 2010 U.S. Dist.
LEXIS 107838, at *10 (S.D.N.Y. Sept. 30, 2010) ("The proper venue to bring a § 2241 challenge
is the district of confinement." (citation omitted)).

[5] The transfer to this Court was appropriate, given Petitioner's transfer to a facility within
this district. *See Jabarah*, 2010 U.S. Dist. LEXIS 107838, at *10.

On May 19, 2010, concerned that Petitioner might have been seeking additional or alternative relief beyond the relief that he requested in his habeas petition, this Court ordered Petitioner to file an amended petition to "clarify [his] claims," so that they could be "appropriately answered by Respondent and ruled upon by the Court." (Order, dated May 19, 2010 (Dkt. 18), at 1.) On June 7, 2010, Petitioner filed an Amended Petition, which is now the operative pleading in this Court. (*See* Pet. Mem.)

In his Amended Petition, as noted above, Petitioner raises four claims. First, he claims that he was denied a "substantial pre-trial right" when, despite Miller's expressed concerns regarding Petitioner's mental competency to participate in his own defense, the Government proceeded to conduct the Investigation and then denied Petitioner's motion for a new Article 32 investigation to cure the purported defect ("Claim One"). (Pet. Mem., at 6.) Second, Petitioner claims that the presiding judge at the court-martial committed a "constitutional error" when he allowed the Government to introduce into evidence certain incriminating statements that Petitioner had made to Dr. Moore and Detective Collins, respectively ("Claim Two"). (*Id.* at 7-9.) Third, Petitioner claims that he received ineffective assistance of trial counsel under the standards set out in *Strickland v. Washington*, 466 U.S. 668 (1984), because, according to Petitioner, Miller (a) waived his objection to the admissibility of incriminating statements made by Petitioner to Nichols, and (b) failed to advise Petitioner that the Government had purportedly proposed to Miller that, in exchange for a guilty plea to a charge of unpremeditated murder by Petitioner, the Government would seek a maximum confinement term of only 40 years ("Claim Three"). (*Id.* at 9-10.) Fourth, Petitioner claims that, because he was not given an opportunity to challenge his transfer from Fort Leavenworth to Lewisburg, he was denied equal protection and

due process of law, and, as a result of his current incarceration in a civilian prison within the BOP, he continues to be denied these constitutional rights ("Claim Four").

As to Claims One, Two, and Three, Petitioner asks that this Court "reverse and remand Petitioner's court-martial conviction and sentence for a rehearing." (Pet. Mem., at 1.)  As to Claim Four, Petitioner asks that this Court "order the respondent to reassign . . . Petitioner to the [USDB] at Fort Leavenworth, . . . for further confinement pending rehearing." (*Id.*)

On August 3, 2010, Respondent filed an opposition to the Amended Petition. (*See* Resp. Mem.)  On September 24, 2010, Petitioner filed a reply. (*See* Petitioner's Reply United States Army's Response, dated Sept. 22, 2010 ("Pet. Reply") (Dkt. 27).)

Subsequent to the filing of his Amended Petition, Petitioner also made an additional application to this Court.  On July 5, 2012, Petitioner filed a motion, informing this Court that he had been recommended for a transfer from Otisville to a "low-level custody facility" within BOP; expressing his concern that, should such a transfer occur, this Court would no longer have jurisdiction to decide the Amended Petition; and asking this Court to "expedite its ruling and/or issue and order to transfer [him] to [either the Metropolitan Correctional Center] in New York or the MDC . . . until the final adjudication of the habeas corpus proceedings." (Motion for Appropriate Relief, dated June 28, 2012 (Dkt. 36).)  On November 1, 2012, while Petitioner's motion was still pending in this court, Petitioner was transferred from Otisville to Victorville, which is not located within this district. (*See* Pet. Not. Address.)

## DISCUSSION

I.    **VENUE**

Notwithstanding the fact that Petitioner is currently confined outside of this district, this Court retains jurisdiction to decide the Amended Petition, as Petitioner was confined within this

district at the time that amended pleading was filed.  *See Dixon v. Terrell*, No. 10-CV-5262

(KAM), 2011 U.S. Dist. LEXIS 111564, at *20-21 (E.D.N.Y. Sept. 29, 2011 ("[I]f a petitioner

brings a habeas petition in a particular district and then is transferred to another jurisdiction

while the petition is pending, the court in which the petition originally was filed retains

jurisdiction." (citing *Rumsfeld v. Padilla*, 542 U.S. 426, 441 (2004))); *see also Berkun v. Terrell*,

No. 12-CV-706 (JG), 2012 U.S. Dist. LEXIS 110283, at *5 n.2 (E.D.N.Y. Aug. 6, 2012) (finding

that although petitioner was currently incarcerated at a facility in Miami, Florida, venue was

proper in the Eastern District of New York, as petitioner was incarcerated within that district at

the time that he had filed his petition).  Moreover, Respondent has not objected to this Court's

retention of jurisdiction based on Petitioner's relocation, and has thus waived any such objection.

*See Smith v. Woosley*, 399 F.3d 428, 434 (2d Cir. 2005) ("Venue objections are waived if not

timely asserted." (citing *Tri-State Employment Services, Inc. v. Mountbatten Surety Co.*, 295

F.3d 256, 261 n. 2 (2d Cir. 2002); *Concession Consultants, Inc. v. Mirisch*, 355 F.2d 369, 371 &

n.1 (2d Cir. 1966))).

   While this Court could, in its discretion, transfer the Amended Petition to the district in

which Petitioner is now being held, the Court notes that this action has already been transferred

once, and that it has been pending for some time.  Accordingly, in the interest of justice, I

recommend that the Court proceed to examine the merits of the Amended Petition.

## II.   APPLICABLE LEGAL STANDARDS FOR REVIEW OF CLAIMS ARISING OUT OF A MILITARY COURT-MARTIAL

### A.   Exhaustion

   A federal court "will not entertain petitions by military prisoners unless all available

military remedies have been exhausted." *Schlesinger v. Councilman*, 420 U.S. 738, 758 (1975);

*Noyd v. Bond*, 395 U.S. 683, 693 (1969) (recognizing the "general rule that habeas corpus petitions from military prisoners should not be entertained by federal civilian courts until all available remedies within the military court system have been invoked in vain"). If a claim was not presented to the military courts, the federal habeas court considers the claim waived and not subject to review. *Watson v. McCotter*, 782 F.2d 143, 145 (10th Cir.), *cert. denied*, 476 U.S. 1184 (1986); *Templar v. Harrison*, No. 05-3009-RDR, 2008 U.S. Dist. LEXIS 23760, (D. Kan. Mar. 19, 2008), *aff'd*, 298 Fed. Appx. at 763.

**B.   Standard of Review**

Defendants convicted by military tribunals may petition for habeas corpus relief pursuant to 28 U.S.C. § 2241. *Burns v. Wilson*, 346 U.S. 137, 139 (1953) ("The statute which vests federal courts with jurisdiction over applications for habeas corpus from persons confined by the military courts is the same statute which vests them with jurisdiction over the applications of persons confined by the civil courts."). Even so, a civilian court's habeas review of such convictions is "circumscribed." *Able v. United States*, 155 F.3d 628, 633 (2d Cir. 1998) (citing *Burns*, 346 U.S. at 138-42); *see also Burns,* 346 U.S. at 139 (noting that, "in military habeas corpus, . . . the scope of matters open for review[] has always been more narrow than in civil cases" (citation omitted)). This circumscription stems from a basic principal: where a defendant is tried by a military tribunal, "[j]ustice is afforded on different terms than is found in civilian life because the military is a 'specialized community governed by a separate discipline'" *Able*, 155 F.3d at 633 (citing *Parker v. Levy*, 417 U.S. 733, 744 (1974)). Therefore, in such cases, "a defendant's constitutional rights are diminished." *Able*, 155 F.3d at 633.

In *Burns*, a plurality of the Supreme Court articulated the scope of review to which federal courts must adhere when reviewing decisions of military tribunals: "It is the limited

18

function of the civil courts to determine whether the military have given *fair consideration*" to the habeas petitioner's claims. 346 U.S. at 144 (emphasis added; citation omitted). Thus, "when a military decision has dealt *fully and fairly* with an allegation raised in that application, it is not open to a federal civil court to grant the writ [of habeas corpus] simply to re-evaluate the evidence." *Id.* at 142 (emphasis added); *see also Lips v. Commandant, United States Disciplinary Barracks*, 997 F.2d 808, 811 (10th Cir. 1993) ("Only when the military has not given a petitioner's claims full and fair consideration does the scope of review by the federal civil court expand." (following *Burns*)); *Fletcher v. Outlaw*, 578 F.3d 274, 278 (5th Cir. 2009) (concluding that review of petitioner's habeas claims was inappropriate, as the military courts had given petitioner's claims "full and fair" consideration (citing *Burns*)). The *Burns* Court, however, did not address the scope of "fair consideration," and, in the nearly 60 years since *Burns* was decided, neither the Supreme Court, the Second Circuit, nor any court within this circuit seems to have done so.

In the absence of such law, this Court finds persuasive, as have other federal courts, the reasoning of the 10th Circuit, *see e.g.*, *Sharp v. United States Army*, No. 9:04-CV-1070 (LEK/VEB), 2008 WL 163595, at *4 (N.D.N.Y. Jan. 16, 2008) (collecting cases); *accord Fletcher v. Outlaw*, 578 F.3d 274, 277 n.2 (5th Cir. 2009) (citing *Sharp*), which is the circuit with the most developed jurisprudence in military prisoner habeas corpus matters, *see Brosius v. Warden*, 278 F.3d 239, 244 (3d Cir. 2002) ("The Tenth Circuit, . . . has the most experience with habeas petitions filed by service members due to the location of the Disciplinary Barracks at Ft. Leavenworth, Kansas." (citations omitted)). In *Dodson v. Zelez*, 917 F.2d 1250, 1252-53 (10th Cir. 1990), the 10th Circuit identified four factors that are helpful in determining whether review of a military conviction on habeas corpus is appropriate:

19

> 1. The asserted error must be of substantial constitutional dimension . . . . 2. The issue must be one of law rather than of disputed fact already determined by the military tribunals . . . . 3. Military considerations may warrant different treatment of constitutional claims . . . . 4. The military courts must give adequate consideration to the issues involved and apply proper legal standards.

*Id.* These factors, however, do "not constitute a separate hurdle but merely aids our determination of whether the federal court may reach the merits of the case." *Roberts v. Callahan*, 321 F.3d 994, 997 (10th Cir. 2003). In fact, they "place a large amount of discretion in the hands of the federal courts." *Dodson*, 917 F.2d at 1253.

Furthermore, notwithstanding the 10th Circuit's enunciation of these factors, that court and others have repeatedly held that, where a military court has denied a claim that has been briefed and argued before it, that court must be found to have given the claim "fair consideration," even if the court disposed of the issue summarily with the mere statement that it did not consider the issue meritorious or requiring discussion. *See Watson*, 782 F.2d at 145; *see also Taylor v. Inch*, 343 Fed. Appx. 343, 346-47 (10th Cir. 2009) (reaffirming *Watson*); *Fletcher v. Outlaw*, 578 F.3d 274, 278 (5th Cir. 2009) (affirming the district court's denial of petitioner's habeas petition where the district court had relied on *Burns* and *Watson* to conclude that, although the military court had summarily disposed of the petitioner's claims, the military court had given the claims full and fair consideration); *Ramsey v. Stansberry*, No. 5:06-HC-2187-D, 2007 U.S. Dist. LEXIS 95343, at * 11 (E.D.N.C. July 17, 2007) (stating that "the summary nature of the military court's dismissal does not prevent the court from finding that an issue was given full and fair consideration" (citing *Watson*, 782 F.2d at 145)).

20

III.   **PETITIONER'S CLAIMS**

A.   **Claims One, Two, and Three**

For the reasons discussed below, Petitioner's first three habeas claims were all exhausted in the military courts, but were also all "fully and fairly" considered by those courts, taking them outside the purview of this Court.

Petitioner's first claim (Claim One) is that he was denied a "substantial pre-trial" right because (i) the Government conducted the Investigation, despite defense counsel's expressed concerns regarding Petitioner's mental competency to participate in his own defense during the Investigation, and (ii) the Government denied Petitioner's subsequent motion for a new Article 32 investigation. (Pet. Mem. at 1, 6.) As noted above, however, during the pre-trial phase of the proceedings, Colonel Hardy considered Petitioner's objections to the Investigation, and, on June 15, 1997, denied Petitioner's pre-trial motion for a new Article 32 investigation. (*See* 5/1/97 Mem.) Moreover, Petitioner twice presented this same argument to the military appellate courts. First, in his December 2008 habeas petition to the ACCA, Petitioner made the same claim regarding the Investigation as he does here. (*See* 12/26/08 Pet.) As part of that petition, he submitted the same pre-trial motion on which Colonel Hardy had ruled. (*See id.* at AR001284.) He also submitted a brief, a declaration, and numerous exhibits. The ACCA considered Petitioner's petition, and, in a summary order, denied the petition. (*See* 1/8/09 Order.) Second, Petitioner filed a writ-appeal petition to review the ACCA denial (*see* 1/28/09 Pet.), including, *inter alia*, the same pre-trial motion that he had submitted to both the ACCA and to Colonel Hardy (*see id.* at AR001150). The CAAF considered and denied the writ-appeal petition. (*See* 4/28/09 Order (writing that the January 2009 writ-appeal petition was docketed

21

and, "[o]n consideration thereof, it is, by the court . . . ORDERED:  That said petition is hereby denied.").)

Petitioner's second habeas claim (Claim Two) is that the judge who presided at his court-martial erroneously allowed the Government to introduce into evidence incriminating statements that Petitioner made to Dr. Moore and Detective Collins, thus violating Petitioner's Fifth Amendment right against self-incrimination.  (Pet. Mem., at 6-9; Pet. Reply, at 10-17.)  More specifically, Petitioner contends that the judge erroneously allowed Detective Collins to testify that Petitioner made the following statement to him:  "'If your old lady was out there fucking everybody on the base, what would you do?  . . .  You would have killed her, too.  You would have done the same thing I did.'"  (Hearing Tr., at 790:11-18.)  Petitioner further contends that the judge erroneously allowed the Government to introduce into evidence certain statements that Petitioner made to Dr. Moore regarding Petitioner's state of mind at the time that he killed Jennifer.  As set out above, however, both parts of Petitioner's claims were already raised before the trial-level (*see* 5/20/02 Pet. Mem., at 42; Hearing Tr., at 1031:9-32:17; *id*. at 1762:21-63:8) and appellate military courts, including the ACCA (*see* 12/26/08 Pet., at AR001162) and the CAAF (*see* 1/28/09 Pet., at AR001012), which of each declined to grant Petitioner relief (*see* 3/2/05 Opinion, at 9; 1/8/09 Order; 4/28/09 Order).

Petitioner's third claim (Claim Three), which is also based on two separate sub-claims, is that he received ineffective assistance of trial counsel.  In particular, Petitioner alleges that his attorney, Miller, (i) failed to object to the admissibility of certain testimony provided by Nichols, and (ii) failed to advise Petitioner of a plea offer purportedly made by the Government.  This claim is grounded in the Sixth Amendment, which affords criminal defendants the right to counsel.  Further, as the Constitution "envisions counsel's playing a role that is critical to the

22

ability of the adversarial system to produce just results," *Strickland*, 466 U.S. at 685, "'the right to counsel is the right to the effective assistance of counsel,'" *id.* at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). As with Petitioner other claims, his ineffective-assistance-of-counsel claim was fully briefed to both the ACCA (*see* 12/26/08 Pet.) and the CAAF (*see* 1/28/09 Pet.). The ACCA considered and denied Petitioner's claim (*see* 1/8/09 Order), as did the CAAF (*see* 4/28/09 Order).

Although Petitioner claims that the ACCA and CAAF "manifestly refused" to consider Claims One, Two, and Three (Pet. Mem. at 5), his submissions provide no evidence that supports this conclusory assertion, and the record shows otherwise. Petitioner's remaining arguments on these claims are simply lengthier versions of arguments previously presented to the ACCA and CAAF, supported by essentially the same evidence.

Where, as here, the record indicates that Petitioner's claims were briefed to, and considered by, the military courts, this Court "has no authority to reach the merits of Petitioner's claims." *Watson*, 782 F.2d at 145. Nor should this Court reach the merits of Petitioner's claims simply because they were summarily denied by the military courts, as the record is sufficient to establish that these claims were given "fair consideration" by those courts. *Id.* For this reason, I recommend that the Court deny Petitioner's first three claims for habeas relief.

**B.   Claim Four**

Petitioner's forth claim is that he was denied equal protection and due process of law because, after being confined at Fort Leavenworth for the first eight years of his life sentence, the Army transferred him to Lewisburg, without first giving him an opportunity to be heard, and that he continues to be denied his constitutional rights because he remains confined at a civilian prison within the BOP. (*See* Pet. Mem., at 10-14.) In support of this claim (Claim Four),

23

Petitioner argues that all military prisoners, regardless of where they are confined, are similarly situated and must therefore be subject to the same conditions, but that military prisoners who are confined at facilities within the BOP, such as Petitioner, are subject to disparate treatment regarding certain aspects of parole and clemency procedures, and with respect to their access to legal materials. (*Id.* at 10-13; Pet. Reply, at 21-27.)

This claim should also be considered exhausted, as Petitioner raised it fully before both the ACCA and the CAAF; further, like Petitioner's first three claims, the claim is subject to dismissal on the ground that it was fairly considered and denied by these military courts. (*See* 4/7/10 Pet.; 5/19/10 Notice; 1/12/08 Pet.; 1/30/08 Order.) In this instance, however, Respondent has not opposed the claim this basis (*see* Resp. Mem., at 21-25 (failing to argue that Claim Four was "fully and fairly" considered but, rather, arguing that this claim is meritless), perhaps because this claim – unlike Petitioner's other claims – only arose after Petitioner was already convicted and serving his sentence. In any event, even if this Court were to reach the claim on its merits, it would still fail.

First, the Army plainly acted within its statutory powers when it transferred Petitioner to the BOP. Indeed, pursuant to 18 U.S.C. § 858(a), Congress has expressly empowered the military to transfer military prisoners to prisons within the BOP. As provided by statute:

> Under such instructions as the Secretary concerned may prescribe, a sentence of confinement adjudged by a court-martial or other military tribunal, . . . may be carried in to execution by confinement in any place of confinement under the control of any of the armed forces or in any penal or correctional institution under the control of the United States . . . . Persons so confined in a penal or correctional institution not under the control of one of the armed forces are subject to the same discipline and treatment as persons confined or committed by the courts of the United States . . . .

24

*Id.*

Second, "a prisoner generally has no due process right to challenge a transfer from one facility to another." *Prins v. Coughlin*, 76 F.3d 504, 507 (2d Cir. 1996) (citing *Meachum v. Fano*, 427 U.S. 215, 225 (1976)).[6] Further, to the extent Petitioner is challenging the constitutionality of 18 U.S.C. § 858(a) on the ground that he and other military prisoners are entitled to certain advantages that may not be accorded to civilian prisoners (*see* Pet. Mem., at 12), his claim is entirely without support.

Notwithstanding Petitioner's assertions to the contrary (*see* Pet. Mem., at 12), "[c]ourts interpreting § 858(a) have 'consistently held that a military prisoner who is committed to the service of his sentence in a federal penitentiary automatically becomes entitled to any advantages and subject to any disadvantages which accrue to the civilian prisoner,'" *Hirsch v. Secretary of the Army*, No. 98-1468, 1999 U.S. App. LEXIS 3372, at *4-5 (10th Cir. 1999) (quoting *Stewart v. United States Board of Parole*, 285 F.2d 421, 421-22 (10th Cir. 1960)), including the same federal parole and clemency procedures that are provided to civilian prisoners, *see Hirsch*, 1999 U.S. App. LEXIS 3372, at *5-6 (citing *In Roberts v. United States Dept. of the Navy*, No. 91-6326, 1992 U.S. App. LEXIS 6970, at *4 (10th Cir. 1992); *Bates v. Wilkinson*, 267 F.2d 779, 780 (5th Cir. 1959)). Despite Petitioner's complaints in this regard, his treatment as a civilian prisoner does not offend the Constitution. *See Koyce v. United States Board of Parole*, 306 F.2d 759 (D.C. Cir. 1962) ("There is no unconstitutional discrimination or other denial of due process because of the recognition by Congress that it is desirable and feasible for persons

---

[6] Although *Prins* did note one possible exception to this principle, that exception – "where the transferee facility reasonably lacks any opportunity whatsoever for the exercise of [the transferred] prison's religion," *Prins,* 76 F.3d at 507 (citing *Salahuddin v. Coughlin*, 993 F.2d 306 (2d Cir. 1993)) – that exception has no bearing in this case.

confined in such institutions as Lewisburg to be subject to certain specified and salutary parole conditions, notwithstanding [that] like provisions have not been deemed desirable or feasible for those who serve their sentences in a military prison.").

As Plaintiff's fourth claim was fairly considered and rejected by military courts, and as Petitioner has not demonstrated any constitutional defect in 18 U.S.C. § 858(a) with respect to the treatment of those who have been convicted in military tribunals, the claim should be denied.

## CONCLUSION

For all of the foregoing reasons, I recommend that the Petitioner's Amended Petition for a writ of habeas corpus (Dkt. 20) be DISMISSED in its entirety. I further recommend that Petitioner's Motion for Appropriate Relief (Dkt. 36) (seeking transfer to the MCC or the MDC during the pendency of this matter) be denied as moot. I also recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), because Petitioner has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (adding three days for service by mail). Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Ronnie Abrams, United States Courthouse, 500 Pearl Street, Room 620, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Abrams. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF

OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.  *See Thomas v. Arn*, 474 U.S.

140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993);

*Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58

(2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

     If Petitioner does not have access to cases cited herein that are reported only on [Westlaw

and/or LEXIS], he may request copies from Respondents' counsel.  *See* Local Civ. R. 7.2

("Upon request, counsel shall provide the *pro se* litigant with copies of [cases and other

authorities cited therein that are unpublished or reported exclusively on computerized databases]

as are cited in a decision of the Court and were not previously cited by any party.").

Dated:  New York, New York
       January 23, 2013

                        Respectfully submitted,

                        DEBRA FREEMAN
                        United States Magistrate Judge

Copies to:

Hon. Ronnie Abrams, U.S.D.J.

Mr. Peter T. Roukis
# 17364-045
FCI Victorville Medium II
P.O. Box 3850
Adelanto, CA 92301

Mr. Brandon Herbert Cowart, Esq.
U.S. Attorney's Office, SDNY
86 Chambers Street
New York, NY 10007